# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**TYS, INC.,**                                    Chapter 7
          Debtor                                 Case No. 07-10531-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

# MEMORANDUM

## I. INTRODUCTION

The matters before the Court are three requests for compensation made by Michael

B. Feinman, Esq. ("Attorney Feinman") pursuant to 11 U.S.C. § 543(c)(2) relating to his

services as Assignee for the Benefit of Creditors of TYS, Inc. (the "Debtor" or "TYS").  In

total, Attorney Feinman seeks $30,653.76.[1]  The Chapter 7 Trustee objected to all requests

for compensation.

The Court conducted an evidentiary hearing on November 30, 2009 at which

Attorney Feinman testified and ten exhibits were introduced into evidence, including

---

[1] Attorney Feinman seeks reimbursement for attorney's fees.  The record does not reflect that he employed himself as counsel in his capacity as Assignee.  Thus, the Court shall construe his requests for compensation in his capacity as a custodian only. *See* 11 U.S.C. § 101(11) ("The term 'custodian' means . . . assignee under a general assignment for the benefit of the debtor's creditors . . . .").

"Stipulated Facts Requiring No Further Proof."  Following the trial, the parties submitted

post-trial briefs. [2]

The Court now makes the following findings of fact and conclusions of law in

accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

TYS was a Massachusetts corporation formerly engaged in the business of the retail

sale of fireplace and barbecue equipment, as well as the  wholesale and retail distribution

of propane, with locations in Massachusetts, Maine and New Hampshire.  Beginning in

April 2006, Eugene Harris ("Harris"), was the president, treasurer and clerk, and a director,

of the Debtor.  Harris's wife, Phyllis Ryan ("Ryan"), was the assistant treasurer, and is

alleged to have been a director.  From at least April 2006 until January 4, 2007, Harris and

---

[2] Following the trial, Attorney Feinman filed a Motion to Strike Portions of the
Chapter 7 Trustee's Post Trial Memorandum.  Upon consideration of the Motion and
the Trustee's Opposition, the Court shall enter an order denying the Motion to Strike.
Attorney Feinman specifically objected to a footnote in which the Trustee referenced a
"question of law as to whether the assignment was properly authorized;" a reference to
the expenses incurred by the Trustee with respect to undoing the Assignment for the
Benefit of Creditors and references to the sale of assets to NEFP and a discussion
relating to the sale and other adversary proceedings, which ostensibly were not
introduced into evidence.  The Trustee responded, noting that the Court can take
judicial notice of its own docket. *See* In re Hyde, 334 B.R. 506, 508 n.2 (Bankr. D. Mass.
2005).  The Court agrees with the position espoused by the Trustee.  Nevertheless, the
portions of the Trustee's Memorandum to which Attorney Feinman objected are not
dispositive of the issues before the Court, and the Court has relied almost exclusively
on the parties Stipulated Facts and Attorney Feinman's testimony, rather than the
contents of the briefs.

Additionally, the Court denies Attorney Feinman's request to introduce his
affidavit and that of Thomas Raftery, Esq. set forth in his Motion to Strike. The Court
sustained the Trustee's objection to admission of the affidavits as hearsay, and Attorney
Feinman proffered no reason to reconsider that ruling.

Ryan exercised exclusive control over the overall management of the business and finances of the Debtor, as well as the day-to-day operations of the Debtor.

Between January 2006 and July 2006, Harris and Ryan advanced nearly $600,000 to the Debtor to fund the continuing operations of its business. On or about October 31, 2006, WEH Business Trust ("WEH"), a Massachusetts business trust which held 100% of the stock of the Debtor and for whom Harris and Ryan served as two of three trustees,[3] caused to be sold a portion of a separately incorporated business held by it, namely its wholesale and retail propane distribution business - to a third party, Ferrellgas, for the sum of approximately $3.8 million (the "Ferrellgas Sale"). Following the payment of the secured

---

[3] The parties failed to identify WEH in the Stipulated Facts. The Court takes judicial notice that on March 21, 2008 the Chapter 7 Trustee commenced an action against Feinman in which he alleged that Attorney Feinman committed:

> attorney malpractice stemming from his conflict of interest arising from his simultaneous and mutually exclusive representation of the Debtor and the interests of its principals, by which he facilitated the preferential repayment of the inside principal of monies advanced to the corporation, and subsequent repurchase of the business of the Debtor as a turnkey operation from Attorney Feinman, acting as assignee for the benefit of creditors, through a new corporation, using the very funds that had been preferentially transferred to them.

In conjunction with that litigation, the parties filed a Joint Pretrial Memorandum in which they stipulated to facts relating to the identity and ownership of WEH. The Court takes further judicial notice that the Chapter 7 Trustee and Attorney Feinman compromised the claims set forth in the adversary proceeding. The Stipulation of Settlement, which this Court approved, specifically did not "constitute an admission of liability in any manner or fashion on the part of [Attorney] Feinman, and [Attorney] Feinman expressly denie[d] any liability for the claims raised in the Adversary Proceeding. *See generally* In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008); In re Hyde, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005).

3

creditor of WEH from the proceeds of the Ferrellgas Sale, there was approximately $1 million in cash available from that sale.  Moreover, after the Ferrellgas Sale, TYS had unsecured debts in excess of $1.3 million, together with contingent liabilities on real estate leases, in addition to the amounts allegedly advanced by Harris and Ryan.

On or about November 7, 2006, Harris and Ryan met with Attorney Feinman, who practices in the area of bankruptcy and insolvency law, for the purpose of seeking insolvency related advice.  They had never met Attorney Feinman, and he had never represented either of them individually or the Debtor.  Rather, Charles Nierman, Esq. had represented  TYS.  Attorney Nierman's office was a referral source for Attorney Feinman for clients with insolvency problems, and Attorney Nierman referred TYS to him.

During the course of their introductory meeting, Harris and Ryan described in general terms the financial condition of TYS and its affiliates.  Attorney Feinman advised Harris and Ryan that he required a retainer, as well as documents pertaining to TYS's finances in anticipation of a possible Chapter 11 petition for TYS.

On or about November 17, 2006, Harris and Ryan, on behalf of TYS, returned to Attorney Feinman's office and engaged him as attorney for TYS for the purpose of obtaining recommendations about a possible workout or commencement of a Chapter 11 case, as well as related financial issues.  Attorney Feinman requested, and was paid, a $5,000 retainer, identified as an advance deposit on fees, pursuant to an Engagement Agreement executed by Harris as president of TYS on that date.  He also obtained copies of leases and an accounts payable aging.

4

Pursuant to the Engagement Agreement, Attorney Feinman represented that he would provide legal services to TYS and bill for services and expenses, including "such things as conferences with others on your behalf, legal research necessary to properly advise you, preparation of documents and correspondence, discussions and negotiations with other parties, interoffice conferences with lawyers and staff and travel time." Additionally the Engagement Agreement provided: "We [attorneys associated with Feinman Law Offices] can terminate our services at any time so long as you give us written notice. We can discontinue our services if you do not pay us or if we feel we can no longer properly represent you for any reason."

Attorney Feinman testified about one telephonic conference with Harris:

Mr. Harris explained to me that he had a very - - he was very upset with his brother, how his brother had managed the company into its financial condition. He had indicated to me that a part of any plan of reorganization for the company, that he wanted to form a new company to buy out the business. I indicated to him that he needed to get separate counsel to address those issues. I specifically told him I could not wear two hats, I could not serve his interests and the interests of the company.

As a result of Attorney Feinman's advice, Harris retained Thomas Raftery, Esq. ("Attorney Raftery") to represent him with respect to personal financial issues. On or about December 15, 2006, Attorney Raftery formed a corporation known as NEFP, Inc. ("NEFP"), whose president and sole shareholder was Ann Lynch ("Lynch"), Ryan's sister and Harris's sister-in-law. NEFP's principal place of business was identified as 140 South Main Street, Middleton, Massachusetts, the same address at which TYS was then maintaining its principal place of business.

5

TYS never sent Feinman Law Offices written notice terminating its services, and Attorney Feinman never sent TYS a termination notice with respect to their attorney/client relationship. Attorney Feinman's itemization of professional services does not reveal that Feinman Law Offices formally discontinued its service, and, as will be discussed below, Attorney Feinman did not exhaust the $5,000 retainer obtained by his firm.

On or about January 4, 2007, Harris, as the owner of fifty-two percent of the shares of the Debtor, representing his interest in WEH Business Trust, purportedly authorized the Assignment for the Benefit of Creditors (the "Assignment"), pursuant to which all of the assets of the Debtor were assigned to Attorney Feinman as Assignee.[4] The Assignment, which was executed by Harris as president of TYS and by Attorney Feinman, provided: "The Assignee, *primarily in the interest of creditors*, shall hold and manage the Trust Property, receive and collect the rents, income and proceeds thereof, and convert the Trust Property into money as rapidly as he may think expedient, and in such manner as he may think best." (emphasis supplied). It also provided that the Assignee was to pay claims in the order of priority set forth in the Bankruptcy Code with "any balance remaining to the Debtor."

Attorney Feinman submitted his first invoice to TYS on or around January 3, 2007, one day before the execution of the Assignment. The invoice contained time entries beginning on November 17, 2006 and ending on December 14, 2006. On December 9, 2006,

---

[4] As noted in note one above, Attorney Feinman objected to the Trustee's reference to the issue of whether the Assignment was properly authorized. The parties, however, used the word "purportedly" in their Stipulated Facts.

Attorney Feinman charged TYS $687.50 for "Compile assignment; vote and assent forms for review by debtor and Thomas Raftery. [sic]"  On December 14, 2006, he charged TYS $330 for "Review of documents; Telephonic conference call with Thomas Raftery and Richard Erricola [the appraiser engaged to value the business and assets of TYS] concerning execution of assignment."[5]  In total, Attorney Feinman, who was the sole attorney involved in matters relating to TYS, sought a total of $3,685 from TYS, leaving a balance of $1,315.  Thus, at the time of the execution of the Assignment for the Benefit of Creditors, Attorney Feinman owed the Debtor $1,315 resulting from the unused portion of his firm's retainer.

On January 5, 2007, one day after the execution of the Assignment for the Benefit of Creditors, Attorney Feinman, as Assignee, sold substantially all of the remaining assets of the Debtor to NEFP.  NEFP continued to operate the same retail business which the Debtor had operated under the name "Yankee Fireplace," in the same locations in Middleton, Massachusetts and Arundel, Maine, and Harris and Ryan managed its day-to-day operations.  NEFP purchased the Debtor's assets for a stated consideration of $800,000, of which $80,000 was paid by NEFP as a deposit, with the remaining $720,000 to be paid over five years in monthly installments of approximately $6,000, pursuant to a promissory note (the "Note") payable to the Assignee. That Note was secured by the assets of the business.

---

[5] This was the first mention of Richard Erricola in Attorney Feinman's itemization of his services to TYS.  Additionally, the itemizations suggest that Attorney Feinman was billing TYS for services he was performing, or intended to perform, as Assignee beginning on December 9, 2006.

Under the terms of the Note, a balloon payment in excess of $550,000 was due at the conclusion of the five-year term. There was not evidence that Attorney Feinman conducted any due diligence with respect to NEFP. Because NEFP was making payments to the Assignee over a five year period, it was incumbent upon him to ascertain its financial capabilities and its ability to pay and the identity and experience of its officers, directors, and management. In view of the absence of that information, Attorney Feinman undoubtedly knew that NEFP was an entity through which Harris could maintain control of the business of TYS.

Attorney Feinman did not advertise the sale of TYS's assets or solicit other offers or counteroffers. Indeed, while he was negotiating the sales price, he shared the appraised value of the business with Attorney Raftery, who represented both Harris, who had expressed a wish to maintain control of the business, and NEFP, the buyer.

Prior to the execution of the Assignment for the Benefit of Creditors, Harris and Ryan received a total of at least $579,987.44 from the Debtor, in repayment of amounts they claimed to have advanced to the Debtor (the "Payments"). They received at least $497,000 from the assets of TYS between November 13, 2006 and December 28, 2006, a period spanning the period when Attorney Feinman represented TYS. Prior to the January 4, 2007 Assignment for the Benefit of Creditors, Harris and Ryan used a portion of the assets of TYS to purchase a substantial quantity of new inventory, which was ultimately sold to NEFP pursuant to the Assignment, to the benefit of NEFP and to the detriment of the Debtor's creditors.

8

The initial payment of $80,000 to the Assignee for the purchase of the assets of the Debtor was not funded by NEFP or Lynch, as its sole shareholder; rather, it constituted a portion of the Payments received by Harris and Ryan, who paid at least $80,000 of such funds to capitalize NEFP. These funds, in turn, were paid by NEFP to Attorney Feinman, as Assignee, to acquire the assets of the Debtor.

Attorney Feinman testified that he did not learn of any of the Payments until October of 2007 when the Chapter 7 Trustee conducted an examination of him pursuant to Fed. R. Bankr. P. 2004.

Attorney Feinman testified that he did not discuss the sale price for TYS's assets until he had obtained an appraisal from Richard Erricola ("Erricola"). He testified that he had one meeting in his office with Harris and Attorney Raftery, but subsequent negotiations were with Attorney Raftery by telephone or e-mail. Attorney Feinman indicated that he rejected Harris's initial offer of the liquidation value for the assets. He stated that he "indicated [to Harris] that I would not accept it and would not handle the assignment at that price." Although Attorney Feinman had a telephone conference with Attorney Raftery and Erricola on December 14, 2006, it is unclear precisely when Erricola was employed and by whom. Although the sale of TYS's assets to NEFP was negotiated in December of 2006 and finalized on January 5, 2007, Erricola was paid by Attorney Feinman, as Assignee, on January 26, 2007.

Attorney Feinman, in his March 15, 2007 itemization of professional services as Assignee, disclosed that, on January 4, 2007, he reviewed documentation and appraisals.

On January 9, 2007, he again reviewed information from the appraiser and had a

conference with Erricola.  He testified that Erricola provided him with a liquidation value

for TYS's assets of $240,343 and that he shared that number with Attorney Raftery, adding

that he did not obtain a copy of the appraisal from Erricola until after the physical

appraisal of the assets.  From the sequence of events, it would appear that Attorney

Feinman was purporting to act as Assignee prior to the actual execution of the Assignment

for the Benefit of Creditors.

One day after Attorney Feinman sold the assets of TYS to NEFP, he sent a letter to

all of the creditors of TYS as well as parties in interest.  The letter provided in pertinent part

the following:

> Pursuant to the terms and provisions of the Assignment, as Assignee,
> I have partially liquidated the assets of the company, and will continue to do
> so in order to make distribution to creditors on the terms and conditions set
> forth in the assignment for the benefit of creditors.  The Assignment for the
> Benefit of Creditors executed by the Debtor provides for distribution to
> creditors as would normally be provided for in a bankruptcy proceeding
> commenced on January 4, 2007, using the same priority provisions of the
> Bankruptcy Code. . . .

> As of the present date, I have sold the Debtor's physical assets and
> certain contractual rights to a third party.  A Purchase and Sale Agreement,
> Bill of Sale and related documents have been executed for the sale of the
> physical assets of TYS, Inc. for the sum of $800,000.00.  The sale does not
> include funds on hand in the Debtor's bank accounts, nor does the sale
> include causes of action available to the Debtor against third parties. . . .

> ***

> Finally, in handling this Assignment for the Benefit of Creditors, as
> Assignee, I represent the interests of the creditor body as a whole, and do not
> represent the interests of any particular creditor. . . .

10

Although Attorney Feinman represented in his January 5, 2007 letter that he sold the assets of TYS to a "third party," he did not disclose that NEFP was a newly created entity whose president was Ryan's sister and Harris's sister in law - - an insider as that term is defined in the Bankruptcy Code. *See* 11 U.S.C. § 101(31)(B)(vi).  He also did not disclose that NEFP's principal place of business and address were the same as those of TYS.  Additionally, he did not disclose that Harris was going to be managing NEFP.  With respect to his own involvement, Attorney Feinman did not disclose that he had acted as counsel to TYS beginning on November 17, 2006.  Finally, he did not disclose that he had taken no steps whatsoever to advertise or otherwise market the assets of TYS or solicit counteroffers for its assets.

An involuntary petition for bankruptcy relief was filed by certain unsecured, unpaid creditors of the Debtor on January 29, 2007.  On March 13, 2007, an Order of Relief was entered, and the Trustee was appointed.

Attorney Feinman cooperated fully with the Trustee and promptly turned over his records, provided assistance, and provided an accounting to the Trustee.  On March 15, 2007, he filed his "Final Account by Assignee for the Benefit of Creditors."  He stated that "[a]s of March 4, 2007, total funds on hand were $150,376.80.  Of all funds received by me as Assignee, only one administrative expense was paid in the amount of $5,817.50 to Richard Erricola for an inventory and appraisal of physical assets of the Debtor which were anticipated to be sold."  As noted above, the account showed that Erricola was paid on January 26, 2007.

11

Attorney Feinman filed a Motion for Allowance and Reimbursement of Legal Fees and Expenses on March 15, 2007 to which he attached an itemization of his services beginning on January 2, 2007 and ending on March 15, 2007.  Through his Motion, he sought $14,295 for services and $471.64 for expenses.  Between January 2, 2007 and January 29, 2007, the date the involuntary petition was filed, Attorney Feinman incurred fees totaling $9,022.50 and expenses totaling $450.49.  His itemization reveals that he sought compensation for filing a Reply to the involuntary petition.  In that Reply, which was filed on February 12, 2007, he stated:

> The pre-assignment relationship between various principals of the Debtor entity was acrimonious, and accordingly, in the absence of further information, as assignee seeking to liquidate the assets of the Debtor and to make payments upon creditors [sic], I have concern about the nature of these proceedings.  In the absence of such further information, as assignee I am unable to recommend to the Court to enter an order for relief as requested by the petitioning creditors.[6]

Upon motion by the Debtor and by Order dated July 27, 2007, the Court  converted the Debtor's bankruptcy case from a Chapter 7 proceeding to Chapter 11, and the  Trustee was appointed Chapter 11 Trustee on August 2, 2007.  Following a settlement of certain claims against Harris, Ryan and others, the Debtor's Chapter 11 case was converted back to a Chapter 7 proceeding, and the Trustee was again appointed Chapter 7 Trustee of TYS.

On July 15, 2009, Attorney Feinman submitted a Second Supplemental Request for Compensation seeking $6,480 in fees for professional services and $5,023.12 in expenses.

---

[6] Only the debtor, or a general partner in a partnership debtor that did not join in the petition may file an answer to an involuntary petition. *See*  11 U.S.C. § 303(d).

His itemization set forth a balance forward of $20,483.76 and an adjustment of $1,333.12. The disbursements included $5,000 for a deductible with respect to his professional liability insurance.  As set forth above, he seeks a total of $30,653.76.

From the Stipulated Facts, as supplemented with reference to the documentary evidence and testimony, it is unclear when Attorney Feinman ceased to represent the Debtor and agreed in principle to accept the Assignment for the Benefit of Creditors.   In other words, between December 14, 2006 and January 2, 2007, who did he represent? Attorney Feinman testified that he thought about declining the Assignment, "but the problem was is [sic] that I had only had involvement with Mr. Harris for about two weeks, maybe three weeks at most.  I felt that I could proceed with it without any conflict issues. I didn't recommend the assignment. I didn't pursue it . . . ."  He added that, if he had known that there were insider transfers taking place, he likely would have declined the Assignment.  Additionally, he testified that although Harris told him about preferences to trade creditors he did not tell him about the ones TYS made to him and Ryan, stating that because he was Assignee for only a short period of time, he did not have the opportunity to perform a preference analysis.

## III. POSITIONS OF THE PARTIES

Attorney Feinman maintains that the issue before the Court is whether there is a bright line rule that bars an attorney from acting as an assignee for the benefit of creditors if the attorney-client privilege has attached.  He distinguishes the case relied upon by the Trustee, namely  In re Colony Press, Inc., 83 B.R. 862 (Bankr. D. Mass. 1988).  Attorney

13

Feinman argues that he played an "exceedingly limited role in both scope and time" as counsel to TYS before Harris chose to obtain separate counsel to pursue an assignment for the benefit of creditors.  He also emphasizes that he had no *actual* conflict of interest or *actual* knowledge of any conduct on the part of the Debtor's principals that was later challenged by the Chapter 7 Trustee.

The Chapter 7 Trustee, also relying upon In re Colony Press, Inc., objects to the payment of any fees incurred by Attorney Feinman due to his prior service as counsel to the Debtor. Additionally, he maintains that the services rendered did not benefit the estate or its creditors because they were performed exclusively to benefit the principals of the Debtor and NEFP.  The Trustee asserts that Attorney Feinman's professional obligation to maintain the confidences of TYS, as disclosed to him by Harris, was at odds with his duty to make full disclosure to TYS's creditors as Assignee.  The Trustee maintains that Attorney Feinman knew, or should have known, if proper inquiry had been made, that the Assignment for the Benefit of Creditors had the effect of having nearly $500,000 paid to the Debtor's principals rather than to its creditors within six weeks of the date of the Assignment - a period in which Attorney Feinman was serving as counsel to TYS.  Further, the Trustee states that, had Attorney Feinman obtained knowledge of preferential transfers during the attorney-client relationship, such knowledge would constitute a client confidence that would have precluded him from serving as Assignee.  The Trustee adds that Harris's expressed wish to remain in control was sufficient to create a conflict of interest.

14

With respect to his argument that Attorney Feinman's services did not benefit the estate, the Trustee points to his failure to disclose that the "third party" to whom he sold the assets of TYS was NEFP, a newly formed corporation owned by Harris's sister-in-law, as well as his failure to disclose that Harris was going to continue to manage the business of NEFP, and his failure to disclose that NEFP was going to continue to operate TYS's business from the same location.

The Trustee specifically objects to any fees and costs incurred by Attorney Feinman between April 3, 2008 and July 30, 2009.  The Trustee maintains that fees and expenses incurred by Attorney Feinman, including a $5,000 deductible to his professional liability carrier, did not benefit the estate.  The Trustee also notes that Attorney Feinman failed to account for $1,315, representing the balance of the retainer provided to him by TYS.

## IV. DISCUSSION

### A. Conflict of Interest

The first issue that the Court must resolve is whether Attorney Feinman had a conflict of interest with respect to his representation of the Debtor and his status as a fiduciary to its creditors as Assignee.  Based upon the evidence presented, Massachusetts Rule of Professional Conduct 1.7, and the decision in Colony Press, the Court concludes that Attorney Feinman, in fact, had a conflict of interest when he accepted the Assignment for the Benefit of Creditors, despite his testimony to the contrary.  Attorney Feinman's dual role as counsel to TYS and as Assignee created an irreconcilable conflict of interest due to the adverse interests of the corporation and the constituency of creditors.  *See* In re

15

<u>Colony Press, Inc.</u>, 83 at 865.  In that case, the court explained the conflicting roles of an

assignee and a debtor's attorney.  It stated:

> For example, if Petitioner had learned in confidence from the Debtor of a
> preference or fraudulent transfer made by the Debtor, he would not be
> permitted to disclose this information even though it could be crucial in the
> creditors' decision on whether or not to assent to the Assignment. See Mass.
> Sup. Jud. Ct. R. 3:07, DR 4-101. Petitioner's obligation to be diligent in his
> duties under the Assignment would likely require some "policing" of the
> Debtor to be sure that the Debtor was not holding out on the inclusion of any
> property in the Assignment. But the necessity of such policing appears to
> require him to have declined the Assignment, because under the Canons he
> must decline any proffered employment that is likely to adversely affect his
> exercise of independent professional judgment in behalf of a client. *See* Mass.
> Sup. Jud. Ct .R. 3:07, DR 5-105.
>
> Beyond those considerations, the very terms of the Assignment create
> potential conflict. It grants the Debtor the right to receive back the excess of
> the value of unencumbered property over the total claims of assenting
> creditors. Any questions concerning the amount of a claim, or whether a
> creditor should be permitted to assent, therefore bear directly upon the
> existence or not of surplus going back to the Debtor. Petitioner's
> understandable inclination to favor the Debtor as his client would likely
> cloud his decisions as Assignee concerning these matters. So we appear to
> have yet another violation of Petitioner's professional obligations, the
> obligation to avoid even the appearance of professional  impropriety. *See*
> Mass. Sup. Jud. Ct. R. 3:07, Canon 9.

83 B.R. at 865-66.[7]

---

[7] The court added:

These considerations appear to have prompted some states to pass
legislation which either prohibits a debtor from naming his lawyer as
assignee or gives creditors the power to replace the assignee named by the
debtor. FN2 Massachusetts, whose regulation on the subject of
assignments is minimal ( See Mass.G.L. ch. 203, §§ 40- 42), has imposed no
such restriction. But Congress has done so with respect to the analogous
situation involving the appointment of a trustee under the Bankruptcy
Code

Attorney Feinman's conflict of interest is highlighted by the *fait accompli* he presented to the creditors of TYS in the form of the sale of TYS's assets to NEFP without any marketing or solicitation of higher offers, by his failure to disclose pertinent information about the ownership and management of NEFP to the creditors of TYS, and by his failure to disclose information about his role as counsel to the Debtor.

Massachusetts Rules of Professional conduct address conflicts of interest.   In pertinent part, the Rule 1.7 provides:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
>> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
>>
>> (2) each client consents after consultation.
>
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
>> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>>
>> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Mass. R. Prof. Conduct 1.7.  Even if Attorney Feinman may have believed that he could act as Assignee, less than three weeks after the last time entry for which he charged TYS for

---

Id. at 866.

his services, namely December 14, 2006, he should have formally terminated his

representation of TYS, and, more importantly, disclosed his involvement as counsel to TYS

to its creditors in his January 5, 2007 letter.  Although he was not acting as an attorney to

the beneficiaries of the Assignment, as Assignee, he was acting in a fiduciary capacity to

the creditors of the Debtor.[8]  *See* Mike C. Buckley and Gregory Sterling, What Banks Need

to Know About ABCs, 120 Banking L. J. 48 (Jan.  2003) ("The basic job of an Assignee is to

fulfill the responsibilities of a prudent fiduciary.");  Geoffrey L. Berman and Robert J.

Keach, "The Receivership Alternative"- A Response, 20 Am. Bankr. Inst. J. 26 (July/Aug.

2001).  Thus, his role as Assignee was sufficiently similar to the role of an attorney to

warrant reference to Rule 1.7.

    In <u>In re Colony Press, Inc.</u>, the court stated:

> As a trustee, the Petitioner was required to administer the trust diligently in
> accordance with its terms and in the sole interest of the assenting creditors.
> His position of trust and confidence also mandated full disclosure to the
> assenting creditors of all material facts known to him which related to their
> right under the trust.

83 B.R. at 865 (citing Restatement (Second) of Trusts §§ 170, 173 comment d, and 174).

    Attorney Feinman's omissions in the January 5, 2007 letter were so glaring as to

suggest, at best, willful ignorance or, at worst, collusion with Harris and NEFP so that

---

[8] Additionally, to the extent TYS was insolvent, Harris and Ryan owed fiduciary
duties to the creditors of TYS.  *See* Mike C. Buckley and Gregory Sterling, What Banks
Need to Know About ABCs, 120 Banking L. J. 48 (Jan. 2003).  It was incumbent upon
Attorney Feinman in undertaking fiduciary duties as Assignee to ascertain whether the
principals of the corporation for which he was appointed Assignee had satisfied those
duties with respect to their conduct involving the creation of and sale of TYS's assets to
NEFP.  <u>Id.</u>

Harris could maintain control of the business of TYS.  In this regard,  although Attorney

Feinman testified that he recommended the filing of a Chapter 11 petition to Harris, as

president of TYS, he failed to elicit basic information from him about officer loans, transfers

outside the ordinary course of business, and he inexplicably failed to advise TYS not to

make payments that might be considered preferential and avoidable by a bankruptcy

trustee or an assignee.  Thus, while he was counsel to TYS, TYS made payments of $497,000

to Harris and Ryan who used that money to boost inventory which was purchased by

NEFP, whose sole shareholder was an insider.  Had Attorney Feinman made even minimal

inquiry before accepting the Assignment, he would have learned that as Assignee, he

would have to sue Harris and Ryan, a circumstance that undoubtedly would have

unraveled the very sale he effected and recommended to creditors as Assignee.

As Assignee, Attorney Feinman had a duty to the Debtor's creditors to maximize

the sales price for its assets.  He failed in the performance of that duty by facilitating,

endorsing, and implementing a "back-room deal."  Not only did he share Erricola's

appraisal with Attorney Raftery, he hastily and without any proffered justification, sold

the assets of TYS to NEFP, a newly created entity, with a minimal cash down payment and

a five year payout.  In Colony Press, a case Attorney Feinman attempts to distinguish, the

bankruptcy court disallowed compensation to an assignee who, though conflicted, at least

advertised a scheduled auction by placing ads in The Worcester Telegram, The Boston

Globe and The Providence Journal.  *See* In re Colony Press, Inc., 83 B.R. at 863.

An Assignee is the equivalent of a Chapter 7 trustee.  According to one

commentator,

> [T]he assignee is the analogous equivalent to the Chapter 7 trustee. An ABC's
> purpose is to provide the assignor's creditors with an equal distribution of
> the assignor's estate in proportion to their claims. Once the trust agreement
> is created, the assignee stands in the debtor's shoes and can protect him or
> her from creditors because the assignee now possesses legal and equitable
> title to all assets. In other words, because the debtor no longer has title to his
> or her assets, the creditor cannot attach or execute on the property
> transferred to the assignee.

Jonathan T. Edwards, The Crossroads: The Intersection of State Law Remedies and
Bankruptcy, 18 J. Bankr. L. & Prac. 2, Art. 4 (2009). Given the similar status of assignees
and trustees, this Court finds that an assignee's employment is subject to the same
requirements. *See* 11 U.S.C. §§ 101(14), 327(a) and 701(a)(1); *see also* In re Colony Press,
Inc., 83 BR. at 866. This Court agrees with the court in Colony Press, a case in which the
assignor also served as counsel to the debtor, that "the principle which prevents the
debtor's lawyer from serving as trustee or trustee's counsel because he has a materially
adverse interest, and which denies him compensation if he does serve, also controls the
question of an assignee's compensation under § 543." Id. at 868. Thus, based upon the
weight of the credible evidence, the Court finds that Attorney Feinman was conflicted and
failed to satisfactorily perform his duties as Assignee. The principles set forth in the
Bankruptcy Code dictate the conclusion that Attorney Feinman is precluded from receiving
compensation for his services as assignee because of the material adverse interest he had
resulting from his representation of TYS and the interest of its creditors as Assignee.

B. Benefit to the Estate

Section 543(c) of the Bankruptcy Code provides that "[t]he court, after notice and

a hearing, shall - - . . . provide for the payment of reasonable compensation for services

rendered and costs and expenses incurred by such custodian. . . ."  11 U.S.C. § 543(c).

According to the United States Court of Appeals for the Fifth Circuit,

> A custodian's compensation for "services" and "actual, necessary expenses"
> are an administrative expense of the estate and are thereby entitled to
> priority in the bankruptcy proceedings.  In addition to compensation for
> services and "actual, necessary expenses," a superseded custodian's
> compensation may include "reasonable compensation for professional
> services rendered by an attorney" employed by the custodian to further an
> "allowed"' expense, as well as that attorney's "actual, necessary expenses."

In re Bodenheimer, Jones, Szwak & Winchell L.L.P., __ F.3d __, 2009 WL 5103546 at *4 (5th

Cir. Dec. 29, 2009).   The Fifth Circuit in Bodenheimer also observed that prepetition

services of a custodian are governed by 11 U.S.C. § 503(b)(3)(E) which provides that the

actual, necessary expenses, other than compensation and reimbursement specified for

professional services of an attorney or accountant to a custodian require benefit to the

estate. 2009 WL 5103546  at *5.  It stated: "[t]he 'benefit' requirement has no independent

basis in the Code, however, but is merely a way of testing whether a particular expense

was truly 'necessary' to the estate:  If it was of no 'benefit,' it cannot have been 'necessary.'"

Id. (citing In re H.L.S. Energy Co., 151 F.3d 434, 437 (5th Cir.1998)) (footnote omitted).  The

Fifth Circuit explained:

> [T]he "benefit to the estate" requirement for "services" of pre-petition
> liquidators and post-petition custodians is supported by long-established
> pre-Bankruptcy Code precedent. The "benefit to the estate" doctrine was first
> recognized in Randolph & Randolph v. Scruggs, where Justice Holmes,
> writing for a unanimous Court, held that a state-law assignee of a debtor's
> estate was entitled to seek payment for services that he undertook prior to
> the adjudication of the bankruptcy, inasmuch as those services benefitted the
> bankruptcy estate. The Court added, however, that "[w]e are not prepared

to go further than to allow compensation for services which were beneficial to the estate. Beyond that point we must throw the risk of his conduct on the assignee, as he was chargeable with knowledge of what might happen." The Court also concluded that the assignee's decision to contest the bankruptcy once it had commenced did not appear to be a benefit to the estate, and therefore resulting fees were not allowable expenses entitled to priority.

Since the Supreme Court's decision in <u>Randolph</u>, Congress enacted the Bankruptcy Code. Admittedly, Congress made no mention of the "benefit to the estate" rule in the provisions of the Code governing the services of superseded custodians. However, "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" <u>Dewsnup v. Timm</u>. Indeed, we must "not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." <u>Cohen v. de la Cruz</u>. There is no indication that Congress intended to overturn the "benefit to the estate" doctrine when passing the statutes governing payment to superseded custodians. Indeed, the legislative history points to the contrary.

2009 WL 5103546  *5 (footnotes omitted).  Thus, the Fifth Circuit concluded that "the language of § 543 clearly circumscribes the actions of superseded custodians to those which are necessary to preserve the assets of the estate once a bankruptcy petition has been filed." 2009 WL 5103546 at * 6.

In view of the foregoing, the Court agrees with the Chapter 7 Trustee that Attorney Feinman's services and the disbursements for which he seeks reimbursement, provided no benefit to the bankruptcy estate.  For the reasons set forth in the discussion concerning his conflict of interest, the Court concludes that his services and disbursements not only failed to benefit the bankruptcy estate but delayed its administration.

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order denying Attorney Feinman's

22

requests for compensation in this case.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: February 5, 2010
cc: Mark W. Corner, Esq., Matthew R. Johnson, Esq., Michael B. Feinman, Esq., Joseph Braunstein, Esq.

23